## UNITED STATES v. KEITEL et al.

(District Court, D. Colorado.   December 30, 1907.)

### No. 2,022.

1. CRIMINAL LAW—CRIMES AGAINST UNITED STATES—VIOLATION OF DEPARTMENT REGULATIONS.

   Violation ·of regulations prescribed by a government department cannot be made the basis of a criminal charge, in the absence of a statute distinctly declaring such violation to be a criminal offense.

2. CONSPIRACY—CONSPIRACY TO DEFRAUD UNITED STATES—ELEMENTS OF OFFENSE.

   To constitute a conspiracy, to defraud the United States within Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], the object of the combination must be to accomplish, by concerted action, a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful by criminal or unlawful means.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 60.]

3. SAME—ENTRY AND PURCHASE OF PUBLIC LANDS UNDER COAL LAND ACT.

   An indictment which charges that defendants conspired to hire persons to make entry and purchase of public lands of the United States under the coal land act, with money furnished by defendants, such lands to be conveyed by the entrymen to a corporation, for the purpose of enabling the corporation to acquire a larger quantity of such lands than it could lawfully purchase under the act, does not charge a conspiracy to defraud the United States within Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], where it is not averred that such entrymen were not legally qualified to make the purchases they did, nor that they severally acquired more land than the acreage limited by·the act.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 60.]

4. PUBLIC LANDS—PRESENTING FALSE PAPERS—"JURISDICTION" DEFINED.

In Rev. St. § 4746, as amended in 1898 [U. S. Comp. St. 1901, p. 3279], which makes it a criminal offense for any person to procure the making or presentation of any false or fraudulent affidavit or other paper or writing pertaining to any matter "within the jurisdiction of the Commissioner of Pensions or of the Secretary of the Interior" the word "jurisdiction" is used in its legal sense, meaning authority to hear and determine a cause, and the provision, if applicable at all to anything outside of pension or bounty land matters, does not apply to papers or writings presented to the officers of a local land office relating to the entry or purchase of lands under the public land statutes in which the Secretary of the Interior has no power to act except in case of an appeal. Nor, if applicable to any such papers or writings, would it apply to such as are not required by statute, but only by a regulation made by the land department.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 28.

For other definitions, see Words and Phrases, vol. 4, pp. 3876–3885; vol. 8, pp. 7697–7698.]

## On Motion to Quash Indictment.

The indictment, in its first count, charges that the defendant F. W. Keitel, and his 10 codefendants, on June 11, 1904, in the county of Garfield, in the county of Routt, in the county of Denver, and within the district of Colorado, did unlawfully, etc., conspire, etc., together and with divers persons, some of whom are named and some whose names are to the grand jurors unknown, to make false, fictitious, feigned, illegal, forged, and fraudulent entries and filings, and to induce, persuade, procure, and hire divers other persons called "entrymen" and mentioned by name in the overt acts (from 1 to 24, both inclusive) to make false, fictitious, illegal, feigned, forged, and fraudulent entries and declaratory statements, applications to enter, powers of attorney, nonmineral affidavits, and affidavits at purchase in said entries at the United States Land Office at Glenwood Springs, in said district, of certain tracts of coal lands of the said United States, to wit, the tracts mentioned in the overt acts as well as other tracts to the grand jurors unknown, amounting to 5,000 acres of the value of $500,000, and at and in the making of such false, etc., entries and declaratory statements, applications to enter, and powers of attorney, nonmineral affidavits, and affidavits at purchase in said entries, to make representations and statements of fact to the register and receiver of said land office, which would be known by the defendants, agents, and entrymen to be false, fraudulent, forged, and untrue in certain matters hereinafter specified, and thereby wrongfully, fraudulently, etc., cause the register and receiver and the Commissioner of the General Land Office to act in administering the laws and regulations in that behalf made in pursuance of law, otherwise than they would or lawfully could act were they aware of such falsity, fraud, etc. That is to say, cause the said register and receiver and Commissioner to accept such false, fraudulent, etc., entries and filings herein specified from defendants, agents, and entrymen, and approve and make sale of such lands to such entrymen, agents, and. defendants, and cause patents for such lands to be issued by the United States to said entrymen, agents, and defendants. The said register and receiver and Commissioner would in that behalf have no knowledge as to such facts and of such false, fraudulent, etc., entries, and would be authorized and required to act by the said laws and regulations, and receive such fraudulent filings and untrue statements and representations and false, etc., entries as though they were true and in compliance with said laws and regulations; it being the intention and design of the defendants to furnish such entrymen with the moneys necessary to make payment to the receiver of the said land office of the price fixed by law for the said lands, and thereupon require and receive conveyances from said entrymen and agents to themselves, the defendants, and the Yampa Anthracite Coal Company, a corporation, and to thereby, by means of said false, fraudulent, etc., entries and filings, to indirectly, deceitfully, and fraudulently obtain for themselves and said corporation from the United States, its said public lands in quantities greatly in excess of that which either, or any, or

all of the said defendants and said corporation would lawfully be allowed to obtain directly from the United States, under a lawful administration of the said laws and regulations; and in that manner to defraud the United States of its lands and of its governmental function and out of its right to an intelligent and honest administration of its service in that behalf. Said unlawful conspiracy was to be effected in the manner and by the means and methods now here described, "that is to say: On the said June 11th, 1904, there was lying in the Glenwood Springs land district * * * certain surveyed vacant public lands of the said United States known as coal lands * * * which were then open to entry at the said land office * * * under the laws of the said United States * * * and under the rules and regulations theretofore made and prescribed pursuant to law by the Commissioner of the General Land Office, * * * that is to say, the coal lands mentioned and described in this indictment, and by legal subdivisions in the said overt acts numbered one to twenty-four, inclusive, in the first count, and one to sixteen in the second count. And the said defendants directly and through their said agents, by persuasion, promise, solicitation and payment of reward to the said entrymen and agents in some small sum the amount whereof is to the grand jurors unknown, to induce, procure and hire the said entrymen, and agents to make said false, fictitious, feigned, illegal, forged and fraudulent entries of said coal lands and filings hereinabove referred to, at the said land office * * * in quantities allowed by law * * * under which the said entrymen, agents and defendants were severally falsely and fraudulently to execute and furnish to the said register and receiver all the necessary papers, declarations and statements and filings above specified, falsely purporting to be under oath, in said false, fictitious, illegal, feigned, forged and fraudulent entries in lieu of the honest and bona fide entries, papers and filings required by the said laws and regulations from such entrymen in connection with the making of such entries, to the effect that each of said entrymen hereinafter charged in the several overt acts was then and there purchasing and intending to purchase his respective tract of such land for himself and not directly or indirectly for the use and benefit of any other person, and that he was in the actual possession of the same." The indictment then charges that such statements, representations, affidavits, and filings would not be made under oath before an officer competent to administer an oath; that the jurats thereto would be false, fictitious, forged, and fraudulent; that such entrymen would then well know that he would not then be purchasing or intending to purchase such lands for himself at all, but in collusion with and for the benefit of the defendants and said corporation, and would not then be in the actual possession of the same, and would be purchasing and intending to purchase his tract for the use and benefit of the defendants and said corporation; that under said agreement said entrymen were, by means of said false, fictitious, illegal, feigned, forged, and fraudulent entries, and by payment to the receiver of the price fixed by law for such coal lands, to obtain title by patent and the use and benefit of said coal lands, said money being furnished to said entrymen by the defendants, and said entrymen were to thereafter make conveyance of said lands to said defendants and said corporation.

The first count then proceeds to set out 24 overt acts. The first overt act charges that the defendants F. W. Keitel and Arie Keitel on June 21, 1904, did file and cause to be filed with the register and receiver of the land office at Glenwood Springs, coal cash entry No. 246 of one Margenau, and the papers, statements, and affidavits, therein, to wit, declaratory statements, power of attorney, nonmineral affidavit, corroborating nonmineral affidavit, and application at purchase for 160 acres of coal lands there described, the said defendants having theretofore procured, hired, induced, and persuaded the said Margenau to subscribe his name to the said false, fictitious, forged, and fraudulent papers in said coal land entry. The second overt act charges that the same two defendants on the same day unlawfully induced, persuaded, and hired one Barnes to subscribe his name to a certain nonmineral affidavit required by law and the rules and regulations of the Interior Department in the said coal land entry of said Margenau, to which affidavit said Barnes did not make oath, and the said two defendants thereafter filed the same with the register and receiver as a part of said entry. The third overt act charges that

the same two defendants on the same day did file and cause to be filed with said register and receiver coal cash entry No. 242 of one Dodge the same character of papers and statements as named in the first overt act above. The fourth overt act charges that the same two defendants on the same day by the same means set out in overt act No. 2, procured said Barnes to make the same kind of written statement in the Dodge entry as charged in the second overt act to have been made in the Margenau entry, which paper defendants filed with the register and receiver. The fifth overt act is like unto the first in coal cash entry No. 244 of one Gus Haberbeck. The sixth overt act is like unto the second, that is, in procuring a statement from Barnes in the Haberbeck entry which defendants filed with the register and receiver. The seventh overt act is like unto the first in its charge as to coal cash entry No. 247 of one Magdalena Haberbeck. The eighth overt act is like unto the second in the procuring and filing of a like statement from said Barnes. The ninth overt act is of date December 10, 1904, and charges that the same two defendants made a certain nonmineral affidavit in the matter of the coal cash entry No. 279 of H. A. Meyer, and in procuring said Meyer to subscribe his name to certain other papers, statements, and affidavits in said coal cash entry. The tenth overt act charges that defendant F. W. Keitel on December 24, 1904, did make a certain nonmineral affidavit in coal cash entry No. 281 of Ben Hock, and file the same with the register and receiver, and procured and hired said Hock to sign and file in said entry certain other papers, statements, and affidavits. The eleventh overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver, coal cash entry No. 276 of one Anna Dodge, and the papers, statements, and affidavits therein, the said Anna Dodge having made and executed false, fictitious, and fraudulent papers in said coal entry. The twelfth overt act charges that the defendant F. W. Keitel on December 10, 1904, made a nonmineral affidavit in the coal entry of said Anna Dodge last aforesaid, and filed the same with the register and receiver, and filed the other papers therein, to wit, declaratory statement, power of attorney, nonmineral affidavit, and application at purchase, said Anna Dodge having theretofore made and executed said papers. The thirteenth overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver coal cash entry No. 272 of one Durnin, and other papers therein as above noted, which papers the defendants had procured and hired the said Durnin to sign. The fourteenth overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver, in the entry of said Durnin, a certain power of attorney constituting one Rodda as the agent and attorney for said Durnin in said entry, the said defendants having procured and hired said Durnin to subscribe his name to said false, fictitious, feigned, forged, and fraudulent power of attorney without making oath to the same. The fifteenth overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver, coal cash entry No. 270 of one Harnett, and the declaratory statement, power of attorney, nonmineral affidavits, corroborating nonmineral affidavits, and application at purchase for the 160 acres of coal lands there described, they having theretofore procured and hired said Harnett to subscribe his name to said fraudulent papers. The sixteenth overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver in the said entry of said Harnett a certain power of attorney appointing one Rodda the attorney of said Harnett in said entry, having theretofore procured and hired said Harnett to subscribe his name to said false, fictitious, forged, and fraudulent power of attorney without making oath to the same. The seventeenth overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver coal cash entry No. 274 of one Kate M. Kaplinger, and the declaratory statement, power of attorney, nonmineral affidavit, corroborating nonmineral affidavits, and application at purchase for the 160 acres of coal lands there described, said defendants having theretofore hired and persuaded said Kaplinger to subscribe her name to said false, fictitious, forged, and fraudulent papers. The eighteenth overt act

charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver in the entry of said Kaplinger a certain power of attorney appointing one Rodda her attorney, the said defendants having theretofore hired and persuaded said Kaplinger to subscribe her name to said false, fictitious, forged, and fraudulent power of attorney without making oath to the same. The nineteenth overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver coal cash entry No. 271 of one Hyman, and the declaratory statement, power of attorney, nonmineral affidavit, corroborating nonmineral affidavits, and applications to purchase for the 160 acres of lands there described, they having theretofore hired and induced said Hyman to subscribe his name to said false and fictitious papers. The twentieth overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver in the coal entry of said Hyman, a certain power of attorney identical, in effect, to the powers of attorney above described. The twenty-first overt act charges that the two Keitels, defendants, on December 27, 1904, did file and cause to be filed with the register and receiver coal cash entry No. 278 of one Charles F. W. Haberbeck, and the other papers like unto the ones above described, and by the defendants obtained in the same manner as above set out. The twenty-second overt act charges that the defendant, F. W. Keitel, on December 10, 1904, made a certain nonmineral affidavit in the coal entry of said Charles F. W. Haberbeck and filed the same, together with other papers, with the register and receiver as above set out in the other overt acts, the said papers having been obtained from the said Haberbeck in the manner above described. The twenty-third overt act charges that the two Keitels, defendants, on February 2, 1905, filed and caused to be filed with the register and receiver coal cash entry No. 293 of one Lucas, and like papers obtained in like manner from said Lucas, as above set forth in other overt acts. The twenty-fourth overt act charges that the two Keitels, defendants, on December 17, 1904, did persuade and hire one Hewett to subscribe his name to a certain nonmineral affidavit required by law and the rules and regulations of the Interior Department, to which affidavit the said Hewett did not make oath, and thereafter file the same with the register and receiver as a part of a coal land entry.

The second count of the indictment charges a like conspiracy as in the first, but charges that the same was made and to be carried out in violation of section 4746, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3279], it then charges that the conspiracy was to consist in part in procuring, inducing, persuading, and hiring divers persons called "entrymen," and mentioned by name in the overt acts in this count, to make and subscribe and present, and cause to be made, subscribed, and presented, to the register and receiver false, fictitious, feigned, illegal, forged, and fraudulent filings, declarations, affidavits, and certificates, and papers and writings purporting to be such, pertaining to the entry of said coal lands, and that said matter and proceeding before said register and receiver was within the jurisdiction of the Secretary of the Interior. That these declarations, affidavits, certificates, writings, papers, and filings so procured to be made by said entrymen were false, fictitious, feigned, illegal, forged, and fraudulent, and in violation of said section 4746; that these false and fraudulent papers contained false and fraudulent statements material to the proceedings in the entry of said lands. It is then charged that the purpose of the unlawful conspiracy was to be accomplished in the same manner as set forth in the first count. The sixteen overt acts set forth in the second count are so like those set forth in the first count that it is not necessary to notice them here in detail for the purpose of considering their legal effect. It will only be necessary to consider sections 5440 and 4746 Rev. St. U. S., as applicable to this count. To this indictment, and both counts thereof, motions to quash have been interposed.

Ernest Knaebel, Sp. Asst. Atty. Gen., for the United States.

Frederick N. Judson, Tyson S. Dines, and Edwin H. Park, for defendants.

## First Count.

LEWIS, District Judge (after stating the facts as above). The indictment, in the first count, attempts to charge a conspiracy under section 5440, Rev. St. [U. S. Comp. St. 1901, p. 3676]. That section and the act of March 3, 1873, known as the "Coal Land Act," will require consideration. Act March 3, 1873, c. 279, 17 Stat. 607 [U. S. Comp. St. 1901, p. 1440]. The indictment shows that the entries were what are commonly called "cash entries," made under the first section of that act, and not what are known as preferential entries provided for under sections 2 and 3 of the act. The only filing with the register by the entryman under the first section of the act, if any, is his application. Hence the indictment, wherein it charges the making of false, etc., powers of attorney, nonmineral affidavits, and affidavits at purchase and other representations and statements made to the register and receiver, must be taken as charging a violation of the rules and regulations of the Land Office Department and the practice in the local land offices.

We first put out of view these rules and regulations, for they cannot be made the basis of a crime. In United States v. Eaton, 144 U. S. 677, 687, 12 Sup. Ct. 764, 767, 36 L. Ed. 591, it is said:

"Much more does this principle apply to a case where it is sought substantially to prescribe a criminal offense by the regulation of a department. It is a principle of criminal law that an offense which may be the subject of criminal procedure is an act committed or omitted 'in violation of a public law, either forbidding or commanding it.' 4 Am. & Eng. Enc. of L. 642; 4 Bl. Com. 5. It would be a very dangerous principle to hold that a thing prescribed by the Commissioner of Internal Revenue, as a needful regulation under the oleomargarine act, for carrying it into effect, could be considered as a thing 'required by law' in the carrying on or conducting the business of a wholesale dealer in oleomargarine, in such manner as to become a criminal offense punishable under section 18 of the act. * * * Regulations prescribed by the President and by the heads of the departments, under authority granted by Congress, may be regulations prescribed by law, so as lawfully to support acts done under them and in accordance with them, and must thus have, in a proper sense, the force of law; but it does not follow that a thing required by them is a thing so required by law as to make the neglect to do the thing a criminal offense in a citizen, where a statute does not distinctly make the neglect in question a criminal offense."

To the same effect are the following: United States v. United Verde Copper Co., 196 U. S. 207, 25 Sup. Ct. 222, 49 L. Ed. 449; United States v. Manion (D. C.) 44 Fed. 800; United States v. Maid (D. C.) 116 Fed. 650; United States v. Blasingame (D. C.) 116 Fed. 654; United States v. Hoover (D. C.) 133 Fed. 950; United States v. Matthews (D. C.) 146 Fed. 306. When these rules and regulations are put by the side, what have we left? In substance, this: that the defendants, under several agreements with qualified entrymen, induced said entrymen to severally enter at the land office coal lands within the limit of acreage prescribed by the act, for the use and benefit of the corporation and defendants, and pay for the same with moneys of the corporation. The only inquiry now is, whether we can find in what is left a crime under the second clause of section 5440, to wit, a conspiracy to defraud. The words of that clause of the section do not specifically

spell out an offense. We look to the common law to find what they mean. In Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, it is said: "The courts of the United States * * * resort to the common law for the definition of terms by which offenses are designated." Certainly the term "defraud" as here used cannot be accepted in its broadest sense. If so, it would cover constructive fraud, known only in equity; and thus, until the chancellor decrees on given facts, no man knoweth what offenses he hath committed. That sequence impresses me as a legal perversion.

Thus, it seems, that the case of the Trinidad Coal & Coke Company, in 137 U. S. 161, 11 Sup. Ct. 57, 34 L. Ed. 640, so much relied on by the prosecution, cannot be carried over into the domain of criminal jurisprudence, to be used here for the purpose of defining that term. It would therefore appear that the broadest stretch to which we can carry the term is to take it in its criminal aspect as known, if so known, to the common law. And when we seek to do that, no authority has been cited where the term has been used to sustain that view, so needful here. We can make the attempt to so understand it, by analogy; but that step leads at once to find the crime by construction and implication, which we are not permitted to do. If the cases and doctrine at common law were obviously and unmistakably apposite, then it would not be construction, and the path would be clear. But they are not. In Todd v. United States, 158 U. S. 278, 282, 15 Sup. Ct. 889, 39 L. Ed. 982, we find this:

"It is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute unless clearly within its terms. 'There can be no constructive offenses, and before a man can be punished his case must be plainly and unmistakably within the statute.' United States v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080; Endlich on the Interpretation of Statutes, § 329 (2d Ed.); Pomeroy's Sedgwick on Statutory and Constitutional Construction, 280."

But returning to the common law—there was there the offense known as cheats. It involved the use of a false device or token. It was carried also to the use of latent adulterations in food prepared for man and intended for use by many. They are discussed by Mr. Wharton in his work on Criminal Law (7th Ed.) vol. 2, § 2056 et seq. These might be called primary offenses. Thereafter an act of Parliament made the obtaining of goods and chattels by false pretenses a crime; and like statutes are found in most of the states. The act of Parliament did not, however, extend this offense to the acquisition of realty. After a full discussion of the statutory offense last referred to, the same author treats of conspiracy as an offense, and in the course of his discussion reaches conspiracies where the means used are not criminal to accomplish an end not criminal; to which we find this preface (section 2316):

"At the same time it is important to keep in mind, especially at this point, the principles heretofore announced, that indictments for conspiracy, always perilous to liberty from the extent and vagueness of the province which they overshadow, are never so much so as when they undertake to punish acts of whose intrinsic criminality the law gives no prior notice. If indictments of this class, by stress of settled adjudications, must be hereafter tolerated, the

doctrine on which they rest should be carried no further than the letter of these adjudications require."

In the list of cases which he then classifies as falling under this head we find none bearing any similitude to the crime here sought to be charged. I think it may be fairly concluded, from what that and other authors on criminal law say, as well as from the adjudicated cases, that in such conspiracies the ends intended by the conspirators must necessarily involve moral turpitude of the basest sort, in the results, if successful—such as threaten the health of a large body of people by the sale of impure food; or in some instances, even life. The latter kind is aptly illustrated in United States v. Stone (D. C.) 135 Fed. 392. I am, therefore, deeply impressed with the belief, that the Chief Justice meant his definition in Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, to cover both clauses of section 5440. He said:

"A conspiracy is sufficiently described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means;"

—saving, perhaps, such cases as when the facts bring them clearly within the rare common-law doctrine, supra. The entrymen were qualified as such, they obtained no more land than the acreage limited by the act, and they paid the price fixed by Congress. The only offending charged against the defendants is that by their procurement the entrymen acted for the corporation. The act does not denounce what they did as criminal, nor does it place a prohibition against their conduct, so that we could say their acts are therefore unlawful.

But their acts are said to be violative of the policy disclosed by the coal land act. In Hadden v. The Collector, 5 Wall. 107, 111, 18 L. Ed. 518, Justice Field, speaking for the court, said:

"What is termed the policy of the government with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes."

When the coal land act was passed, little was known of the locality and extent of coal measures in this western country; and, if we were permitted in this case to seek for a policy in that act, we would say that the predominant one was to induce the discovery and development of such deposits. If we could search further for a policy applicable in this day, we would first weigh the appropriate words of Sharswood:

"Time itself, which works such mighty changes in all things, produces a state of circumstances, not in the mind of the lawgiver."

And, in connection with what has already been said, it is necessary to bear in mind the rules of construction here applicable. In Smith v. Townsend, 148 U. S. 490, 497, 13 Sup. Ct. 634, 636, 37 L. Ed. 533, we find this:

"Statutes against frauds are to be liberally and beneficially expounded. This may seem a contradiction to the last rule; most statutes against frauds being in their consequences penal. But this difference is here to be taken:

Where the statute acts upon the offender, and inflicts a penalty, as the pillory, or a fine, it is then to be taken strictly; but when the statute acts upon the offense, by setting aside the fraudulent transaction, here it is to be construed liberally." 1 Bl. Com. 88.

In France v. United States, 164 U. S. 676, 17 Sup. Ct. 219, 41 L. Ed. 595, it is said:

"The statute does not cover the transaction, and, however reprehensible the acts of plaintiff in error may be thought to be, we cannot sustain a conviction on that ground. Although the objection is a narrow one, yet the statute being highly penal, rendering its violator liable to fine and imprisonment, we are compelled to construe it strictly. * * * If it be urged that the act of these plaintiffs in error is within the reason of the statute, the answer must be that it is so far outside of its language that to include it within the statute would be to legislate, and not to construe, legislation."

The rules of strict construction in favor of a defendant charged with a crime, as well as the presumption of innocence and the requirement that guilt must be proven beyond a reasonable doubt, are priceless heritages that have come down to us as warnings out of the bloody pages of tyranny and oppression. And while there be some who doubt their present-day necessity, they remain unbroken. For further cases sustaining the rule, see United States v. Clayton, 2 Dill. 219, Fed. Cas. No. 14,814; United States v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37; Francis v. United States, 188 U. S. 375, 23 Sup. Ct. 334, 47 L. Ed. 508; United States v. Benecke, 98 U. S. 447, 25 L. Ed. 192.

I am clearly of the opinion that the first count does not state an offense, and the motion to quash is therefore sustained.

## Second Count.

The indictment attempts to charge in the second count, an offense under the first clause of section 5440, to wit, a conspiracy to commit an offense against the United States. The means to be used, as heretofore seen in the discussion on the first count, were neither criminal nor unlawful, but it is claimed that the end to be accomplished is a crime, to wit, a violation of section 4746, which is expressly penal; and it is further claimed that the acts charged bring the case within the terms of the latter section. It is necessary to support the last contention in order to sustain the second count; we therefore direct our attention to that point.

This section 4746 was originally, and prior to amendment, section 33 of the act of March 3, 1873, which was entitled "An Act to Revise, Consolidate, and Amend the Laws Relating to Pensions." Act March 3, 1873, c. 234, 17 Stat. 566. That section (33) was amended by Act July 7, 1898, c. 578, 30 Stat. 718. We here give the original section (33) and the amended section (4746), the amendment being within parentheses, as follows:

"That every person who knowingly or willfully (makes or aids, or assists in the making or) in any wise procures the making or presentation of any false or fraudulent affidavit, declaration, certificate, voucher or paper, or writing purporting to be such, concerning any claim for pension or payment thereof, or pertaining to any other matter within the jurisdiction of the Commissioner of Pensions (or of the Secretary of the Interior), or who knowingly or willfully (makes or causes to be made, or aids or assists in the making, or) presents or causes to be presented at any pension agency any power of attor-

ney, or other paper required as a voucher in drawing a pension, which paper bears a date subsequent to that upon which it was actually signed or acknowledged (executed) (by the pensioner, and every person before whom any declaration, affidavit, voucher, or other paper or writing to be used in aid of the prosecution of any claim for pension or bounty land or payment thereof purports to have been executed, who shall knowingly certify that the declarant, affiant, or witness named in such declaration, affidavit, voucher, or other paper or writing, personally appeared before him and was sworn thereto, or acknowledged the execution thereof, when, in fact, such declarant, affiant or witness did not personally appear before him or was not sworn thereto, or did not acknowledge the execution thereof), shall be punished by a fine not exceeding five hundred dollars, or by imprisonment for a term of not more than five years."

The word "acknowledged," was inserted in place of "executed."

Original section 33 received consideration in the Supreme Court in Edgington v. United States, 164 U. S. 361, 17 Sup. Ct. 72, 41 L. Ed. 467. The subject there specially treated was whether section 5438 was repealed by section 4746 (being original section 33); the court said:

"We are unable to accept the contention that the latter section is to be deemed a repeal of the former. Undoubtedly there is some ground that is common to both. Thus the procuring or causing to be made a false deposition or affidavit in promoting a fraudulent pension claim is made an offense by both statutes. But the earlier statute is wider in its scope, because not restricted to fraudulent pension claims nor to merely procuring a false affidavit to be made."

In Pooler v. United States, 127 Fed. 519, 62 C. C. A. 317, section 4746, as now amended, was construed as applicable only in pension matters.

In view of the foregoing authorities, the title of the act, the phraseology of the section as amended, and the discussion of the amendment (record of which was exhibited in argument),. I think under familiar rules of construction the amended section (4746) must be taken as applicable only to pension matters (or claim for bounty land), before the Commissioner or Secretary. It is urged that the broad language, "or pertaining to any other matter within the jurisdiction of the Commissioner of Pensions or of the Secretary of the Interior" should be taken to cover everything which those officers are given authority to hear. But it must be noticed that all of this was a part of the original act, except the phrase "or of the Secretary of the Interior." Consequently, the original act, in the phrase "or pertaining to any other matter within the jurisdiction of the Commissioner of Pensions," could not under the rule ejusdem generis go beyond the specific subjects therein named, to wit, claims for pension or bounty land; and for greater reason this must be so, when we consider the limited duties and jurisdiction of that officer as they existed then and now. I think the obvious purpose of the amendment, in the particular now considered, was to reach falsification before the Secretary in such matters, when appealed to him from the Commissioner. But inasmuch as two unreported cases from other districts have been called to my attention, in which my Brothers appear to hold to the contrary; and seem to take the view that the phrase "or pertaining to any other matter" should be construed to cover all subject-matters within the

jurisdiction of either the Commissioner or Secretary, I waive my views in that particular here.

We come then to consider how we shall understand the section in this particular: "pertaining to any other matter within the jurisdiction * * * of the Secretary of the Interior." The indictment charges that the false filings, declarations, affidavits, certificates, papers, and writings used in each particular entry was a matter and proceeding before the register and receiver within the jurisdiction of the Secretary of the Interior. The register and receiver are not subordinate officers to the Secretary, in the sense that they act for him and perform duties incumbent on him. They are not his agents. They hold office under appointment by the President. They discharge duties fixed on them by statute. Their findings in some cases are final; in others there is a right of appeal to the Commissioner of the Land Office and from his rulings to the Secretary. What is meant by "jurisdiction" as here used? Its prime conception is one of power. When used in a political sense, it means governmental authority; such as when we say, the federal government has jurisdiction over navigable waters and interstate commerce, such as when we say, a state has jurisdiction over affairs purely local. The section does not use the phrase "within the jurisdiction of the Secretary of the Interior" in that sense. That would smack too much of that imperialism, when the spirit of the Cæsars brooded over a vast empire, from whose capital city an impending hand reached out to its remotest confines. The word "jurisdiction," must be here used in its legal sense, meaning authority to hear and determine a cause. Daniels v. Tearney, 102 U. S. 415, 418, 26 L. Ed. 187; Simmons v. Saul, 138 U. S. 439, 454, 11 Sup. Ct. 369, 34 L. Ed. 1054. But in determining whether the Secretary had authority to hear and determine the matters charged to have been presented to the register and receiver, other statutes must be considered. He could not of his own motion take the matter then pending in the local land office to himself for decision. It could only reach him, if at all, by a process of appeal, as provided by statute. It is not charged that the matter was appealed to him. Indeed, it was tacitly admitted in argument that the matters progressed no further than where they were first lodged in the local land office with the register and receiver. In no event is jurisdiction acquired by a court or officer on whom the law confers the power, until the power so given is exercised or invoked by an interested party. To hold that the Secretary had jurisdiction of the matters charged in the indictment would be to liken jurisdiction in its legal sense to jurisdiction in its political sense, which cannot be done under this statute. I think it clearly appears that the matters charged in the indictment were not within the jurisdiction of the Secretary as contemplated in section 4746.

But aside from this, and waiving all that has been said, it appears from the indictment that the entries of coal lands complained of in the indictment were made under section 1 of the Act of March 3, 1873. That act does not require of the entryman any of the affidavits, certificates, papers, and writings complained of in the second count. These papers must, therefore, have been required, if required at all,

by the rules and regulations of the land office. The act may be said to require, in all propriety, a written application by the entryman showing that he is qualified as such, and has not theretofore exercised his right; but these facts are not negatived. So we view the matters complained of as papers and writings required by rules and regulations. And in that condition we find ourselves again directly in opposition to the principles declared in United States v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591, and many other cases cited, supra. We quote again from the Eaton Case:

"Much more does this principle apply to a case where it is sought substantially to prescribe a criminal offense by the regulation of a department. It is a principle of criminal law that an offense which may be the subject of criminal procedure is an act committed or omitted 'in violation of a public law, either forbidding or commanding it.' 4 Am. & Eng. Enc. of L. 642; 4 Bl. Com. 5. It would be a very dangerous principle to hold that a thing prescribed by the Commissioner of Internal Revenue, as a needful regulation under the oleomargarine act, for carrying it into effect, could be considered as a thing 'required by law,' in the carrying on or conducting the business of a wholesale dealer in oleomargarine, in such manner as to become a criminal offense punishable under section 18 of the act. * * * Regulations prescribed by the President and by the heads of the departments, under authority granted by Congress, may be regulations prescribed by law, so as lawfully to support acts done under them and in accordance with them, and must thus have, in a proper sense, the force of law; but it does not follow that a thing required by them is a thing so required by law as to make the neglect to do the thing a criminal offense in a citizen, where a statute does not distinctly make the neglect in question a criminal offense."

It seems to me that to hold that the second count charges an offense would be going in direct conflict with what is said in the Eaton Case.

For these reasons, the motion to quash the second count is also sustained.