UNITED STATES v. ELEVEN THOUSAND ONE HUNDRED AND FIFTY POUNDS OF BUTTER (MILTON DAIRY CO., Claimant).

(Circuit Court of Appeals, Eighth Circuit. April 17, 1912.)

No. 3,679.

(Syllabus by the Court.)

1. INTERNAL REVENUE (§ 16*)—STATUTORY PROVISIONS—"ADULTERATED BUTTER."

The intention of Congress in enacting and the true construction of the clause "any butter in the manufacture or manipulation of which any process or material is used with intent or effect of causing the absorption of abnormal quantities of water, milk or cream," in Act of May 9, 1902, c. 784, § 4, 32 Stat. 194, 195 (U. S. Comp. St. Supp. 1911, p. 969), is to bring butter containing an abnormal quantity of water, milk, or cream into the class of adulterated butter and to subject it to forfeiture, and its manufacturer to the fines and penalties denounced for a violation of the regulations therein concerning adulterated butter when, and when only, some process or material is used in its manufacture or manipulation, with the intent or effect of introducing into the butter, by absorption, an abnormal quantity of water, milk, or cream.

The presence in butter of an abnormal quantity of moisture does not make it "adulterated butter" under this act.

[Ed. Note.—For other cases, see Internal Revenue, Dec. Dig. § 16.*

For other definitions, see Words and Phrases, vol. 1, pp. 210–212.]

2. INTERNAL REVENUE (§ 16*) — FORFEITURES — PROCEEDINGS — EVIDENCE — "ADULTERATED BUTTER."

Proof of the presence of an abnormal quantity of moisture in butter and of a removal of the butter without a compliance with the regulations concerning the taxing and branding of "adulterated butter" is insufficient to bring such butter within the class of adulterated butter or to sustain its forfeiture as such.

[Ed. Note.—For other cases, see Internal Revenue, Dec. Dig. § 16.*]

3. INTERNAL REVENUE (§ 16*)—REGULATIONS—CONSTRUCTION—"ADULTERATED BUTTER."

The true construction of the regulation of the Secretary of the Treasury, to the effect that butter having 16 per cent. or more of moisture contains an abnormal quantity and is classed as adulterated butter under the clause of the act quoted above, is that it merely defines and fixes the measure of an abnormal quantity of moisture in the butter under this clause.

[Ed. Note.—For other cases, see Internal Revenue, Dec. Dig. § 16.*]

4. INTERNAL REVENUE (§ 16*)—REGULATIONS—VALIDITY.

The regulation so construed is void because, while the Secretary and his subordinates had authority to investigate each case and to decide, for administration purposes in the light of the facts and circumstances of the particular case, whether or not the butter involved therein was adulterated butter and taxable as such, they had neither express nor implied authority by a general regulation to give an authoritative and final definition of the terms, or such a construction of the statute, which should govern all future cases.

[Ed. Note.—For other cases, see Internal Revenue, Dec. Dig. § 16.*]

5. INTERNAL REVENUE (§ 16*)—REGULATIONS—VALIDITY.

If, on the other hand, the correct interpretation of this regulation is, as counsel for the government claims, that it makes all butter which contains 16 per cent. or more, or an abnormal quantity, of moisture "adulterated butter," whether the abnormal quantity was introduced into the butter by the use of some process or material with intent or effect of causing it to be absorbed by the butter or not, then the rule is unau-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

thorized and void, because it has the effect to subject classes of property to forfeiture, and classes of persons to fines and penalties, that are excluded therefrom by the plain terms of the law.

[Ed. Note.—For other cases, see Internal Revenue, Dec. Dig. § 16.*

What constitutes a violation of pure food regulations, see note to Brina v. United States, 105 C. C. A. 559.]

**6. CONSTITUTIONAL LAW (§§ 62, 77\*)—AUTHORITY OF EXECUTIVE OFFICERS.**

Implied authority in an executive officer or department to repeal, extend, or modify an act of Congress may not be inferred from legislative authority to enforce it.

And a regulation of such an officer, or department, made under legislative authority to make rules to enforce an act of Congress which has the effect to subject classes of property to forfeiture, and classes of persons to fines and penalties under the act, that are excluded therefrom by the terms of the statute, is unauthorized and void.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94–102, 141; Dec. Dig. §§ 62, 77.*]

**7. CONSTITUTIONAL LAW (§§ 70, 77\*)—DEPARTMENTS OF GOVERNMENT—EXECUTIVE POWER.**

The definition of offenses, the classification of offenders, and the prescription of the punishment they shall suffer, are legislative and not executive functions.

Violations of regulations of an executive officer, which are not in themselves violations of any legislative act or common law, are not criminal, in the absence of a previous legislative act prescribing a punishment therefor, and neither forfeitures, fines, nor penalties may be prescribed, imposed, or inflicted therefor, either by executive officers, or by courts.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129–132, 137, 141; Dec. Dig. §§ 70, 77.*]

In Error to the District Court of the United States for the District of Minnesota.

Information by United States of America to forfeit Eleven Thousand One Hundred and Fifty Pounds of Butter claimed by the Milton Dairy Company. From a judgment of dismissal (188 Fed. 157), the prosecution brings error. Affirmed.

Charles C. Houpt, U. S. Atty.

W. H. Lightner (Lightner & Young, on the brief), for defendant in error.

Before SANBORN, ADAMS, and CARLAND, Circuit Judges.

SANBORN, Circuit Judge. This writ of error questions a judgment of dismissal of a bill of information filed by the United States to forfeit 11,150 pounds of butter claimed by the Milton Dairy Company, a corporation. There was a trial by a jury, and at the close of the evidence the court dismissed the suit on the grounds that the evidence failed to sustain the libelant's cause of action and that a certain regulation of the Secretary of the Treasury was unauthorized under the law.

[1] Was there any substantial evidence to sustain a verdict for the libelant if the regulation challenged had been duly authorized? The Act of Congress approved May 9, 1902, 32 Stat. c. 784, § 4, pp. 194, 195, defines butter to mean "the food product usually known as butter and which is made exclusively from milk or cream, or both,

with or without common salt, and with or without additional coloring matter." Act August 2, 1886, 24 Stat. c. 840, § 1, p. 209 (U. S. Comp. St. 1901, p. 2228). It then declares that:

"Adulterated butter is hereby defined to mean a grade of butter produced by mixing, reworking, rechurning in milk or cream, refining, or in any way producing a uniform, purified or improved product from different lots or parcels of melted or unmelted butter, or butter fat, in which any acid, alkali, chemical or any substance whatever is introduced or used, for the purpose or with the effect of deodorizing, or removing therefrom, rancidity, or any butter or butter fat with which there is mixed any substance foreign to butter, as herein defined, with intent or effect of cheapening in cost the product, or any butter in the manufacture or manipulation of which any process or material is used, with intent or effect of causing the absorption of abnormal quantities of water, milk, or cream."

And it imposes a special tax on such butter and on the business of making it, requires it to be stamped and branded, and prescribes drastic penalties, one of which is the forfeiture of the product, for the failure of the manufacturer to pay these taxes, and for removing the butter, or causing it to be removed, without paying the taxes upon it and stamping and branding it.

The charge in the libel against this butter was "that in the manufacture and manipulation of said butter the process adopted by the said Milton Dairy Company, the manufacturer thereof, had the effect of causing the absorption and incorporation therein of an abnormal quantity of water, that is to say, that the moisture content of said butter was then and there in excess of 16 per cent., contrary to said act of Congress and the rules and regulations of the Secretary of the Treasury, made and promulgated pursuant to the said act"; that the manufacturer had not paid the special taxes upon it as adulterated butter and was removing it without stamping it or branding it as such. The answer was a denial that any process or material had been used in the manufacture or manipulation of this butter with the intent or effect of causing the incorporation or absorption by it of an abnormal quantity of water, milk, or cream, and an averment that it had been made without the use of any such process and that it was not subject to the taxes and regulations imposed upon adulterated butter. The regulation of the Commissioner of Internal Revenue approved by the Secretary of the Treasury, upon which the libelant relies in this case, was made soon after the passage of the act of 1902, and it reads in this way:

"The definition of adulterated butter as contained in the Act of May 9, 1902, embraces butter in the manufacture of which any process or material is used whereby the product is made to 'contain abnormal quantities of water, milk or cream,' but the normal content of moisture permissible is not fixed by the act. This being the case it becomes necessary to adopt a standard for moisture in butter which shall in effect represent the normal quantity. It is therefore held that butter having 16 per cent. or more of moisture contains an abnormal quantity and is classed as adulterated butter."

[2] In this state of the law and the regulation the libelant introduced evidence tending to prove that the butter here in controversy contained more than 16 per cent. of moisture and rested. It presented no evidence that any process or material was used in the manufac-

ture or manipulation of the butter with the intent or effect of caus· ing the absorption thereby of abnormal quantities of water, milk, or cream. Was this proof sufficient to charge the butter with the special taxes as adulterated butter and the manufacturer with the drastic penalties denounced for the failure to pay it?

The customary and lawful process of making butter from milk or cream, or both, was, when the act of 1902 was passed, and has ever since been, a process of elimination of some, but not all, of the moisture from the milk, cream, and butter. The milk and cream from which moisture is expelled in order to produce butter is a liquid before the process is applied. When the butter commences to appear in the course of its manufacture, it contains much more than 16 per cent. of moisture, and, when the lawful process has been completed, it is common knowledge that much of the butter produced thereby still contains a larger moisture content than 16 per .cent. But butter produced by this simple process of the. elimination of moisture which retains more than 16 per cent. of its original water, milk, or cream, is not butter which has been caused to absorb an abnormal quantity of those substances by any process or material used in its manufacture or manipulation, and hence it is not adulterated butter under the act of Congress. Such butter has neither been made to absorb, nor has it absorbed, any water, milk, or cream. The moisture in it was in the milk and cream of which it was made, and an amount of it sufficient to constitute more than 16 per cent. of the butter still remains in the latter, not because this butter has been made to absorb it by any process or material, but because the customary and lawful process of expulsion of moisture from the milk and cream has not been sufficiently effective to drive out more of the moisture. These facts are patent and in the administration of the law and of the regulation they have forced themselves upon the recognition of the Commissioner and have conditioned his action. Thus on June 6, 1906, he ruled:

"It is well understood that butter produced on a farm is often loaded with water, but it will be seen by references to the regulations these small individual lots are not taken into account in connection with the taxing question, but when these are gathered up and manufactured or manipulated so that they lose their identity as a farmer's product, they enter the sphere where surveillance of the law becomes operative." 9 Treasury Decisions, Internal Revenue, 60.

And on May 25, 1911, he ruled that although the butter of farmers, who make small quantities of it and sell their surplus above family requirements, contains more than 16 per cent. of moisture, yet it is not taxable as adulterated butter, either in their hands or in the hands of merchants or dealers who receive and dispose of it in its original form. 20 Treasury Decisions, Internal Revenue, 104.

Let us now return to the question, bearing in mind the fact that the customary and lawful process of the manufacture of butter is a process of elimination of moisture from milk and cream, and that after the use of that process an abnormal quantity of the original moisture, more than 16 per cent. of the content of the butter, which has not been absorbed, or caused to be absorbed, by the butter by any

process or material used in its manufacture or manipulation, often still inheres and remains in the product.

The members of Congress who passed the act of 1902 were familiar with this common process of making butter. They knew that it was a process of elimination of moisture from the milk and cream, and they did not enact that an abnormal quantity of water, milk, or cream, remaining in the butter made by that process, caused that butter to be adulterated butter. On the other hand, they enacted the contrary, for the declaration by them of those things which did make butter adulterated by the familiar rule excluded all others. They enacted (1) that the introduction or use of an acid, alkali, or other substance in butter, or its use in the manufacture thereof in certain ways, for the purpose of deodorizing or removing rancidity from the butter, (2) the introduction into butter of a substance foreign to it with the intent or effect of cheapening the cost of the product, and (3) the introduction of abnormal quantities of water, milk, or cream, into butter by the use of any process or material with the intent or effect of causing the absorption by the butter of such abnormal quantities of water, milk, or cream, and nothing else, made butter adulterated. They enacted in each case that it was the introduction into the butter of some foreign substance, not the existence in the butter in any quantity of one of its natural and inherent constituents, that caused the butter to be adulterated. Now take the butter in question. An abnormal quantity, more than 16 per cent. of moisture, may have been in it and yet never have been absorbed by it. That amount of moisture may have been a part of the original and inherent moisture in the milk or cream from which the butter was made and which had never been eliminated from it. That amount of moisture may have been absorbed by the butter without the use in its manufacture or manipulation of any process or material with the intent or effect of causing the presence of that quantity of moisture in the butter. Therefore, tested by the maxim noscitur a sociis, for the clauses in pari materia specify the introduction of foreign substances into the butter; by the rule that all the words of a statute must have effect, for if the mere presence of an abnormal quantity of moisture in the butter makes it adulterated butter the words of the clause, "any butter *in the manufacture or manipulation of which any process or material is used with intent or effect of causing the absorption of* abnormal quantities of water, milk or cream," which are here italicized, lose all their effect, are practically expunged and the word "containing" is enacted in their place, so that the clause reads, "any butter containing abnormal quantities of water, milk or cream"; by the rule that every statute should have a rational, sensible construction; by the rule that a penal statute may not be extended to include classes not clearly within its terms; or by any other applicable rule of interpretation—there is no escape from the conclusion that the intention of the Congress and the legal effect of the plain words it used in the clause under consideration were to bring butter containing an abnormal quantity of moisture into the class of adulterated butter when, and when only, some process or material had been used in its man-

ufacture or manipulation with the intent or effect of introducing into the butter, by absorption, abnormal quantities of water, milk, or cream. Hence the burden was upon the libelant in this case to prove: (1) That such a process or such material was used in the manufacture or manipulation of the butter here in controversy; and (2) that it was used with the intent or the effect of causing the butter to absorb abnormal quantities of water, milk, or cream. The libelant produced no evidence to support these propositions, which it alleged in its pleading as the basis of its cause of action. The fact that the butter contained more than 16 per cent., or an abnormal quantity of moisture, was insufficient to sustain either of them.

[3] The regulation of the Secretary in no way relieved the government of the necessity of proving these allegations. The plain purpose and only effect of that regulation was merely to define and fix the measure of an abnormal quantity of moisture in butter under the statute at 16 per cent. or more of the product. It was not the purpose of the Secretary, and it could not have been the effect of his regulation, to repeal or amend the portion of the clause in section 4 of the act of 1902, italicized in the last quotation, to enact the word "containing" in its place and thereby to add other classes of butter to those denounced as adulterated butter by the law, and other classes of manufacturers to those subject by the act of Congress to its drastic penalties. United States v. Wiltberger, 5 Wheat. 76, 96, 5 L. Ed. 37; United States v. Ninety-Nine Diamonds, 72 C. C. A. 9, 12, 13, 139 Fed. 961, 964, 965, 2 L. R. A. (N. S.) 185; St. Louis Merchants' Bridge Terminal Ry. Co. v. United States, 188 Fed. 191, 193, 110 C. C. A. 63. The result is that the evidence in this case was insufficient to warrant a verdict for the government, and for that reason there was no error in the dismissal of the suit.

[5] Had the Secretary of the Treasury lawful authority to make the regulation? If the true construction of this regulation is, as we believe, simply to define the term "abnormal quantity" and to fix definitely at 16 per cent. or more the amount of moisture in butter requisite to constitute an abnormal quantity thereof, this question is perhaps immaterial in this case, because, if that be the true interpretation, as we have seen, there was no substantial evidence that the butter was adulterated, or that its manufacturer violated the law, and hence there was no error in the judgment below. But in addition to fixing the measure of an abnormal quantity of moisture, the regulation declares that butter having 16 per cent. or more of moisture "is classed as adulterated butter," and counsel for the defendant earnestly contends that the true construction of the regulation is that it makes all butter containing 16 per cent. or more of moisture "adulterated butter," subjects it to forfeiture and its manufacturer to the fines and penalties denounced by the statute, where it is not stamped and branded and taxes are not paid on account of it as such, whether this quantity of moisture was introduced into it in its manufacture or manipulation by any process or material used with the intent or effect of causing that result or not. If this be the correct interpretation of the regulation, its legal effect is to modify radically the act of Con-

gress and to bring under its penal provisions property and persons expressly excluded therefrom by its terms, and we inquire by what authority the Secretary may thus create and punish crimes. The answer is, by no express authority, but by the implied power conferred upon him by the Revised Statutes, § 161 (U. S. Comp. St. 1901, p. 80), "to prescribe regulations not inconsistent with law, for the government of his department"; by section 251 (page 138), to make and issue "rules and regulations, not inconsistent with law, to be used under and in the execution and enforcement of the various provisions of the internal revenue laws"; by section 3447 (page 2277), to make "all such regulations, not otherwise provided for, as may have become necessary by reason of any alteration of law in relation to internal revenue"; by sections 14 and 20 of the Oleomargarine Act of August 2, 1886, 24 Stat, 212, which by section 4 of the act of 1902 are made applicable to manufacturers of adulterated butter "to the extent necessary to enforce the marking, branding, identification and regulation of the exportation and importation of adulterated butter," and which provided that the Commissioner of Internal Revenue (section 14) may "decide what substances, extracts, mixtures or compounds, which may be submitted for his inspection in contested cases, are to be taxed under this act, and his decisions in matters of taxation under this act shall be final," subject to an appeal provided later in the section, and that (section 20) he may make "all needful regulations for carrying into effect this act"; and by section 4 of the act of 1902, which provides that every manufacturer of adulterated butter shall "conduct his business under such surveillance of officers and agents as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulation require." But there is nothing in any or all of these provisions of these acts of Congress which either expressly, or by implication, goes farther than to grant the power to the Secretary, or the Commissioner, to enforce by regulations, "not inconsistent with law," as these statutes repeatedly declare, these acts of Congress according to their expressed terms; nothing from which authority to the Secretary, or to the subordinate officers of his department, to repeal, amend, modify, or extend any of the provisions of the act of 1902, much less those penal provisions which specify the classes of persons liable to fines and the classes of property liable to forfeiture thereunder.

[6] Implied authority in an executive officer or department to repeal, extend, or modify an act of Congress may not be lawfully inferred from authority to enforce it, and a regulation of the Secretary of the Treasury, or any other executive officer, made under legislative authority to make rules to enforce an act of Congress, which has the effect to subject classes of property to forfeiture and classes of persons to fines and penalties under the act, that are excluded therefrom by the terms of the law, is unauthorized and void. United States v. Two Hundred Barrels of Whisky, 95 U. S. 571, 576, 24 L. Ed. 491; United States v. Eaton, 144 U. S. 677, 688, 12 Sup. Ct. 764, 36 L. Ed. 591; Williamson v. United States, 207 U. S. 425, 462, 28 Sup. Ct. 163, 52 L. Ed. 278; United States v. Grimaud, 220

U. S. 506, 519, 522, 31 Sup. Ct. 480, 55 L. Ed. 563; St. Louis Merchants' Bridge Terminal Ry. Co. v. United States, 188 Fed. 191, 195, 110 C. C. A. 63; United States v. Keitel (D. C.) 157 Fed. 396, 401; United States v. Three Barrels of Whisky (C. C.) 77 Fed. 963, 964; United States v. Manion (D. C.) 44 Fed. 800, 801; United States v. Hoover (D. C.) 133 Fed. 950; United States v. One Package of Distilled Spirits (D. C.) 88 Fed. 856.

Moreover, the butter here in question may not be forfeited for a violation of this regulation, because no penalty for such a violation has been prescribed by any legislative act. Doubtless Congress might have enacted that the violation of certain rules and regulations of the Secretary, not inconsistent with law, which it authorized him to make, should subject property to forfeiture and persons to fines and imprisonment. But it has failed to declare that the violation of this regulation, or of any regulation of its nature, should have that effect. An offense which may be the subject of criminal procedure must be an act committed or omitted "in violation of public law, either forbidding or commanding it." 4 Blackstone's Comm. 5. A penal statute which creates and denounces a new offense, and the act under consideration is such a statute, may not be lawfully extended by either executive or judicial construction to classes beyond its terms. Men must not be punished unless they fall clearly within the class of persons specified as punishable by such a law.

[7] The definition of offenses, the classification of offenders, and the prescription of the punishment they shall suffer, are legislative, and neither executive nor judicial, functions. And forfeitures, fines, and penalties may not be prescribed, imposed, or inflicted for violations of a regulation of an executive department without previous legislative prescription. United States v. Eaton, 144 U. S. 677, 688, 12 Sup. Ct. 764, 36 L. Ed. 591; United States v. Grimaud, 220 U. S. 506, 517, 519, 522, 31 Sup. Ct. 480, 55 L. Ed. 563; St. Louis Merchants' Bridge Terminal Ry. Co. v. United States, 188 Fed. 191, 195, 110 C. C. A. 63; United States v. Keitel (D. C.) 157 Fed. 396, 401; United States v. Three Barrels of Whisky (C. C.) 77 Fed. 963, 964.

In United States v. Two Hundred Barrels of Whisky, 95 U. S. 571, 573, 24 L. Ed. 491, the act there under consideration required the rectifier to do, and to refrain from doing, certain specified things, empowered the Commissioner of Internal Revenue to make rules to enforce it, and prescribed forfeitures and penalties for the failure of the rectifier to do any of the things by law required to be done by him, and for the doing by him of any of the things prohibited by the act. The Secretary thereupon made a regulation imposing upon rectifiers a requirement in excess of those made by the statute relative to the gauging, inspecting, and stamping of packages of distilled spirits, and a libel was filed to forfeit the whisky there in question for a violation of the law, because this regulation was not complied with. The suit failed. The Supreme Court said:

"The rules and regulations which the Commissioner of Internal Revenue is authorized by section 2 to prescribe cannot have the effect of bringing the case under the operation of the penalty provided in section 96, if it was al-

ready covered by section 57 [Act July 20, 1868, c. 186, 15 Stat. 125, 149, 164]. The regulations of the department cannot have the effect of amending the law. They may aid in carrying the law as it exists into execution, but they cannot change its positive provisions."

In Morrill v. Jones, 106 U. S. 466, 1 Sup. Ct. 423, 27 L. Ed. 267, the statutes provided that animals specially imported for breeding purposes should be admitted free of duty "upon proof thereof satisfactory to the Secretary of the Treasury, under such regulations as he may prescribe." He prescribed a regulation that animals of superior stock adapted to improving the breed in the United States, and those only, should be admitted free under the law. The Supreme Court said:

"The Secretary of the Treasury cannot, by his regulations, alter or amend a revenue law. All he can do is to regulate the mode of proceeding to carry into effect what Congress has enacted. In the present case we are entirely satisfied the regulation acted upon by the collector was in excess of the power of the Secretary."

In United States v. Eaton, 144 U. S. 677, 687, 688, 12 Sup. Ct. 764, 36 L. Ed. 591, the defendant was indicted for a violation of the Oleomargarine Act of August 2, 1886, c. 840, 24 Stat. 209, in that he had failed to keep a book and make a monthly return showing certain matters required by regulation of the Commissioner of Internal Revenue, but not called for by the act itself. The statute required certain books to be kept, but did not specifically require a book to be kept and a monthly return to be made showing the specific matters prescribed by this regulation. This act, however, expressly required the defendant to conduct his business under such surveillance of officers and agents as the Commissioner, with the approval of the Secretary, might by regulation prescribe, authorized the Commissioner to make rules for carrying the act into effect, and by section 18 prescribed punishment by forfeiture and fine for the doing by any manufacturer or dealer of any act prohibited by the statute, and for his failure to do anything required by law in the carrying on or conducting of his business. The Supreme Court held that these provisions of section 18 did not make a criminal offense as a neglect to do a thing required by law, of a neglect to do a thing required only by this regulation of the Commissioner, that the principle underlying the decision in Morrill v. Jones applied with still greater force than in that case where, as in the Eaton Case, 144 U. S. 687, 12 Sup. Ct. 764, 36 L. Ed. 591, an attempt was made in effect to prescribe a crime by a regulation of a department, and that where the act of Congress did not distinctly make the violation of such a regulation a criminal offense, fines and forfeitures could not be imposed or enforced therefor.

In United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563, the defendant was indicted for grazing sheep on a forest reservation without a permit, in violation of a regulation made by the Secretary of Agriculture requiring such a permit, save in cases expressly excepted by the rule. The Act of Congress June 4, 1897, c. 2, 30 Stat. 35, expressly provided that:

"He (the Secretary) may make such rules and regulations and establish such service as will insure the objects of such reservation, namely, to regulate their occupancy and use and to preserve the forests thereon, and any violation of the provisions of the act, or such rules and regulations, shall be punished as prescribed in Revised Statutes, section 5388 [U. S. Comp. St. 1901, p. 3469] as amended"—which provide punishment by a fine and imprisonment.

The Supreme Court carefully and approvingly reviewed its former opinion in Eaton's Case, declared that the very thing which was omitted in the Oleomargarine Act has been distinctly done in the Forest Reserve Act, which in terms provides that "any violation of the provisions of this act, or such rules and regulations of the Secretary shall be punished as prescribed in section 5388 of the Revised Statutes, as amended" (220 U. S. 519, 31 Sup. Ct. 484, 55 L. Ed. 563), and held that the regulation was clearly authorized, that its violation was made criminal and the punishment therefor was prescribed by act of Congress and not by the Commissioner, and it accordingly sustained the prescription.

Here is a vital distinction between the Grimaud Case, on the one hand, and the Eaton Case and the case now under consideration, on the other. In the former the violation of the regulation was made criminal and the punishment therefor was prescribed by act of Congress. In the Eaton Case and in this case the violation of the regulation was not made criminal, nor was the punishment therefor prescribed by any legislative action, and it is plain from the opinion in the Grimaud Case that the prosecution in that suit would not have been sustained had there been no congressional prescription of the penalty for a violation of the regulation there in question.

After these decisions had been rendered, and after they had been carefully considered by this court, it decided the case of St. Louis Merchants' Bridge Terminal Ry. Co. v. United States, 188 Fed. 191, 194, 196, 110 C. C. A. 63, and in that decision Mr. Justice Van Devanter, who had just taken part in the decision in the Grimaud Case, participated, and he concurred in the opinion. In that case the Act of March 3, 1905, c. 1496, 33 Stat. 1264 (U. S. Comp. St. Supp. 1911, p. 1351), authorized the Secretary of Agriculture to make regulations to govern the inspection and shipment of cattle, and other live stock from a quarantined state, and from the quarantined portion of any state, into any other state, provided that such stock might be moved from a quarantined region in compliance with such regulations, but that it should be unlawful for any railroad company to remove from any quarantined region into another state such stock in any other manner or method, or under other conditions than those prescribed by the Secretary, and that any railroad company that violated these provisions should be punished by fine or imprisonment, or both. The Secretary made a regulation governing the transfer of such stock from one railroad company to another after it had passed out of the quarantined region into another state, and the defendant was convicted of violating that regulation. The class of railroad companies and the class of acts punishable by the terms of the statute were railroad companies receiving stock in and transporting it from a quarantined region in one state into another state, and acts done in the course of such receipt and transportation. The effect of the regula-

tion was to add to these classes and to bring under the penalties of the statute other railroad companies receiving the stock outside the quarantined region and other acts done outside that region, and this court held that in so far as it had that effect it was unauthorized and void.

In the case at bar the clause of the Act of May 9, 1902, on which this suit is founded, makes punishable that class of manufacturers, and that class only, which removes, or causes to be removed, without complying with the terms of the act, butter in the manufacture or manipulation of which some process or material is used with the intent or effect of causing the absorption by the butter of abnormal quantities of water, milk, or cream. The regulation, given the construction of counsel for the government, adds to this class, and subjects to the forfeitures, fines, and penalties of the act, that class of manufacturers which removes, or causes to be removed, without complying with the regulating terms of the act, butter containing more than 16 per cent., or an abnormal quantity, of moisture in the manufacture or manipulation of which no process or material is used with the intent or effect of causing the absorption by the butter of abnormal quantities of water, milk or cream, and in so far as it has this effect it is unauthorized by the acts of Congress, either by express declaration or rational implication, and void. The forfeiture of the butter sought in this case cannot be enforced because the regulation of the Secretary which conditions it, given the construction of the government, is unauthorized, and because no punishment for its violation is prescribed by any legislative act.

The fact that the Circuit Court of Appeals of the Sixth Circuit has reached a different conclusion regarding this regulation in Coopersville Co-operative Creamery Co. v. Lemon, 163 Fed. 145, 89 C. C. A. 595, and the opinion rendered in that case, have received our most deliberate and careful consideration. But in view of the considerations which have now been presented and of the decisions in United States v. Two Hundred Barrels of Whisky, 95 U. S. 573, 24 L. Ed. 491, Morrill v. Jones, 106 U. S. 466, 1 Sup. Ct. 423, 27 L. Ed. 267, United States v. Eaton, 144 U. S. 677, 688, 12 Sup. Ct. 764, 36 L. Ed. 591, United States v. Grimaud, 220 U. S. 506, 519, 522, 31 Sup. Ct. 480, 55 L. Ed. 563, and St. Louis Merchants' Bridge Terminal Ry. Co. v. United States, 188 Fed. 194, 196, 110 C. C. A. 63, which in our opinion rule this case, our minds refuse to assent to any conclusion other than that which has been already announced.

[4] The remaining question argued in this case is: Had the Secretary of the Treasury authority to make the regulation if its true interpretation is that it simply fixes the measure of an abnormal quantity of moisture in butter? If the Congress had expressly empowered the Secretary to investigate, to ascertain, to determine, and then, by a general regulation, to define and fix the meaning of the term "abnormal quantities of water, milk or cream" in the statute, there would have been authority to sustain such a regulation. United States v. Grimaud, 220 U. S. 517, 518, 31 Sup. Ct. 480, 55 L. Ed. 563, and cases there cited. In the absence of such express authority, the limit of his power seems to be to decide, for the purpose of levy-

ing the taxes, either himself, or through his subordinates in each particular case, whether or not the butter there in question contains an abnormal quantity of either of those substances. There is a sound reason for this limitation of his authority. What would be an abnormal quantity of moisture in the butter made by one manufacturer, or at one season of the year, or in one climate, might be a normal quantity in the product of another manufacturer, or at another season of the year, or in another climate, or under other circumstances. The Commissioner has himself held in effect that 16 per cent. is not an abnormal quantity of moisture in butter manufactured by farmers, and that it is an abnormal quantity in that manufactured by others. We have already seen that under an act admitting animals imported for breeding purposes "upon proof thereof satisfactory to the Secretary of the Treasury under such regulations as he may prescribe," he had no authority to make a regulation to the effect that the meaning of the law was that animals of superior stock adapted to improve the breed in the United States only might be imported free. Morrill v. Jones, 106 U. S. 466, 1 Sup. Ct. 423, 27 L. Ed. 267.

In United States v. United Verde Copper Co., 196 U. S. 207, 215, 25 Sup. Ct. 222, 49 L. Ed. 449, citizens were permitted by the Act of June 3, 1878, 20 Stat. 88, c. 150 (U. S. Comp. St. 1901, p. 1528), to fell and remove timber or trees from public lands for mining and other domestic purposes "subject to such rules and regulations as the Secretary of the Interior may prescribe for the protection of the timber and of the undergrowth growing upon such lands, and for other purposes." Thereupon he made his rule 7 that:

"No timber is permitted to be used for smelting purposes, smelting being a separate and distinct industry from that of mining."

The Supreme Court decided that this was in effect a definition of the words "other domestic" purposes, and that he had no authority to make such a definition by general rule. It said of the regulation:

"The Secretary of the Interior attempts by it to give an authoritative and final construction to the statute. This, we think, is beyond his power. * * * If rule 7 is valid, the Secretary of the Interior has power to abridge or enlarge the statute at will. If he can define one term, he can another. If he can abridge, he can enlarge. Such power is not regulation; it is legislation. The power of legislation was certainly not intended to be conferred upon the Secretary."

The argument is convincing, and it is authoritative; it applies with as much force to the power of the Secretary in the case at bar as to his power in the Copper Company Case, and the result is that the Secretary of the Treasury had no authority, either express or implied, to fix or define by a general regulation the term "abnormal quantities of water, milk or cream" in butter, or the term "adulterated butter" in the Act of May 9, 1902, and his rule to that effect is void.

Let the judgment below be affirmed.

ADAMS, Circuit Judge, concurs in affirming the judgment on the ground first discussed in the opinion, that the evidence was insufficient to sustain a judgment for the United States, and on other questions, which he thinks are unnecessarily discussed, he expresses no opinion.