### KEANE v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit.   February 2, 1921.)

No. 1853.

Conspiracy ⊂⟶33—Conspiracy to defraud "military post exchange" not one to defraud United States; "department of the government."

A military post exchange, which is a voluntary association of companies, detachments, or other army units at military posts, permitted but not required, by a special regulation of the War Department for the purpose of conducting for the benefit of the members of such units what is in effect a co-operative store and place of entertainment, with their own funds, and for whose contracts and obligations the United States is not responsible, and in whose funds it has no interest, though its business

---

⊂⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

is conducted by an officer detailed for the purpose, *held* not a "department of the government," and proof of a conspiracy to defraud a post exchange *held* not to sustain an indictment, under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to defraud the United States.

Woods, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Criminal prosecution by the United States against Tom Keane. Judgment of conviction, and defendant brings error. Reversed.

Henry E. Davis, of Washington, D. C., and Tazewell Taylor, of Norfolk, Va. (William E. Leahy, of Washington, D. C., on the brief), for plaintiff in error.

Hiram M. Smith, Sp. Asst. U. S. Atty., of Richmond, Va.

Before KNAPP and WOODS, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. This case comes before us on a writ of error to the District Court of the United States for the Eastern District of Virginia, to review the conviction and sentence of the plaintiff in error, hereafter called the defendant, upon an indictment charging him, a salesman representing the T. T. Keane Company, Incorporated, of Washington, D. C., and one Brown, a soldier, with conspiracy to defraud the United States. The defendant is indicted under section 37 of the Criminal Code (Comp. St. § 10201), which is as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

The soldier, Brown, butcher and detailed employé of the post exchange, pleaded guilty in the court below. The indictment in substance charges that the defendants Keane and Brown conspired to increase prices and to list on invoices larger quantities, amounts, and weights than were to be actually delivered, to what is known as a post exchange, which post exchange, the indictment alleges, was duly authorized, organized, and operated under and by virtue of certain rules, orders, and regulations of the War Department of the United States, and which post exchange was operated and conducted for the convenience and orderly functioning of the government of the United States and of the War Department.

The defendant in the District Court presented 15 assignments of error, and among the very first exceptions which the defendant's counsel argued before this court is the following:

"The District Court erred in holding that the post exchange in the indictment mentioned was such an institution as that fraud upon the United States could arise from, or be involved in, any transaction concerning the same under the facts disclosed by the evidence, or in any other way or manner."

In other words, by this exception of the defendant we are met at the threshold of the consideration of this case with the question as to wheth-

er or not the post exchange mentioned in the indictment is such an institution as that a fraud upon the United States can arise from or be involved in any transaction concerning it. Plainly it will be seen that, if it is not such an institution, then no dealing by the defendant Keane with such exchange could operate as or involve a fraud upon the United States, and in so far as this transaction is concerned the defendant could not be indicted for same under section 37 of the Criminal Code above quoted.

In the beginning of this opinion it is proper to say that the case of Haas v. Henkel, 216 U. S. 462, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112, does not decide the point raised by the defendant in the exception we are now considering. The main point decided in the Haas Case was that section 37 of the Criminal Code includes any conspiracy to "impair, obstruct, or defeat the lawful function of any department of the government," such as "the promulgation of officially acquired information in regard to the cotton crop." The indictment in that case specifically averred that the Department of Agriculture includes a Bureau of Statistics "established by law," and this opinion simply holds that, if the conspiracy charged in the indictment was to obtain information from an official of this bureau, established by law, in advance of the general publicity, and to be used in speculating upon the cotton crop, and thereby defraud the United States, by defeating, obstructing, and impeding it in the exercise of its general functions in the regular and official duties of publicly promulgating fair, impartial, and accurate reports concerning the cotton crop, the indictment would lie under section 37 of the Criminal Code.

There was no count in either of the indictments in this case which expressly charged that the conspiracy included any direct pecuniary loss to the United States; but the court, in the opinion written by Mr. Justice Lurton, held:

"It is not essential that such a conspiracy shall contemplate a financial loss or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of the government."

So the question of whether or not the Bureau of Statistics of the Department of Agriculture was or was not a lawful department of government, so as to bring transactions with it within the purview of section 37 of the Criminal Code, was not raised in the Henkel Case at all. Indeed, such point would plainly have been unavailing, because, at the time of the indictment, the Bureau of Statistics was a well-organized department of government, recognized by Congress, and appropriations were being made yearly by Congress for the maintenance of such bureau. Therefore there was no question as to whether or not the Bureau of Statistics was such a lawful department of government; but the question was simply whether or not, the Bureau of Statistics being a lawful department of government, an indictment would lie which did not charge a conspiracy to cause pecuniary loss to the United States, but to impair or obstruct the lawful functioning of that department of government.

In the case we are now considering it is stoutly denied by the counsel for the defendant that a post exchange is such a lawful department of government as would make a conspiracy transaction with it subject to an indictment under section 37 of the Criminal Code. All we have before us as to the establishment and operation of a post exchange is what we glean from a 39-page pamphlet entitled "Special Regulations No. 59—Post Exchange Regulations, 1917," issued by the War Department.

Nowhere in this pamphlet of special regulations is it required or commanded that post exchanges shall be established. Indeed, it is expressly stated in these Special Regulations that these exchanges are voluntary organizations among the soldiers themselves. As best we can gather from these regulations, a post exchange is a voluntary, unincorporated co-operative store at, near, or on a military post; the Secretary of War giving the soldiers at such post a license or privilege to form such a co-operative store. The Secretary of War, in effect, says, in these regulations, to the soldiers, that while they are not required to establish post exchanges, yet, if they do establish them, that they should have for their purpose the supplying to the troops at reasonable prices of the articles of ordinary use, wear, and consumption, not supplied by the government, and to afford them means of rational recreation and amusement, and through exchange profits to provide, when necessary, the means for improving the messes. The regulations suggest that an assessment should be made upon the several organizations contributing to the exchange for the purpose of procuring necessary articles, and that all articles thus procured must be paid for by the first profits of the institution; it being distinctly understood that the officers incurring debts on behalf of the exchange, and not the government, are responsible for the payment thereof.

Members of the exchange must be organizations, companies, detachments, and individual enlisted men cannot become members, unless three or more of them are associated in a mess. The special management of the exchange is conducted by an officer designated and detailed by the commanding officer, and this officer is responsible for the management of the exchange, and is regarded as the custodian of the funds belonging to it. When the exchange is free from debt, at the end of each quarter, a sum sufficient to cover anticipated debts is set aside as a reserve fund, and a percentage of the remainder is distributed among the members, and other parts thereof are set aside for specific purposes, and the remainder may be divided among the organizations contributing to the exchange on an equitable basis; and a division of the cash resources of the exchange is made whenever the troops belonging to the exchange, or any part of them, change their station, and when all the units composing membership in an exchange have gone away or removed from the post, the exchange stock must be reduced to the lowest extent possible and converted into cash; and prior to the departure of the troops the property of the exchange is sold and the proceeds, together with the cash, are distributed among the organizations according to the number of shares held by each. Post exchange funds,

when deposited in a bank, must be placed under their official designations, and not to the credit of the officer who is their custodian, and such funds of a post exchange are especially declared to be not public moneys within the meaning of sections 5488, 5499, and 5492 of the Revised Statutes (Comp. St. §§ 10255, 10302, 10259), and misapplication of such funds by an officer having their custody is punishable, not under the general law, but under the Articles of War. Nowhere in these regulations do we find a rule or even a suggestion that under any possible contingency does or would the government ever receive or come into possession of any of the funds or assets of the exchange.

At this point it is worth while to consider what the Secretary of War, through his official appointees, says of a post exchange in considering claims filed against the government under the Act of March 2, 1919 (Comp. St. Ann. Supp. 1919, §§ 3115¹⁴/₁₅a–3115¹⁴/₁₅c), giving the Secretary of War authority to adjust any express or implied agreements which had been entered into prior to November 12, 1918, by any officer, for the production, sale, or control of equipment, etc., when such agreement has been performed in whole or in part, etc. Under this act the Secretary of War appointed, by authority given him, the members of the War Department Board of Contract Adjustment, and we quote as apropos of our decision in this case some extracts from a decision of this Board of Contract Adjustment; the first being found in volume 1, part 2, at page 160, of the decisions of this Board in the matter of the claim of Landauer Beverage Company, for merchandise sold to various exchanges at Camp Pike. Here Col. Garnett, speaking for the Board, says:

"It having been held that funds of a post exchange are not public moneys, that a building erected on a government reservation with post exchange funds remains the property of the latter, and that organizations participating in a post exchange are proportionately liable for the latter's obligations, citing decisions of the Judge Advocate General to that effect, it is clear that contracts made with authorized buyers for post exchanges are not contracts made by an officer or agent acting under the authority, direction, or instruction of the Secretary of War within the meaning of the Act approved March 2, 1919."

In that case the claimant had sold to various exchanges at Camp Pike 11,000 boxes of chocolate candy at $1.50 a box, and alleged that each authorized buyer signed the order for the candy, and that it was understood by both parties to constitute a binding contract between the claimant and the United States government. In this decision it is said that funds of post exchanges are not public moneys, and that the government is not responsible for the debts of the exchanges, quoting from Special Regulations 59, above referred to, and that it had been held by the Judge Advocate General that a building erected on a government reservation by a post exchange, solely at the expense of the exchange, remains its property, and may be sold by it when it has no further use for the building, and the purchaser may remove the building from the reservation.

In this connection it may be mentioned that these post exchanges are such purely private organizations for the convenience and pleasure of the soldiers themselves that they have been required to pay floor taxes

on tobacco under section 702 of the Revenue Act of February 24, 1919 (Comp. St. Ann. Supp. 1919, § 6204d). The Judge Advocate General's Office, a branch of the War Department, held that these exchanges were subject to floor taxes on tobacco. See Opinions of the Judge Advocate General, 3313, February 28, 1919. We find in the opinion of the Judge Advocate General, No. 158, January 4, 1918, the following illuminating, yet brief, definition of a post exchange, to wit:

"A post exchange is a voluntary, unincorporated co-operative association of army organizations—a kind of co-operative store—in which all share the benefits and all assume a position analogous to that of partners. Contracts to purchase goods entered into by the proper officers of a post exchange should be tested by the same rules of obligation which govern like agreements of individuals. In the event of an inability on the part of a post exchange to pay its debts, the organizations which participate in the post exchange should themselves pay off all such obligations in proportion to their respective interests in the exchange."

In case No. 527, decided by this Department Board of Contract Adjustment, In re claim of U. S. Rubber Co., Mr. Hunt, speaking for the Board, says:

"It appears that the contract in this case was between the claimant and officer acting as agent of the exchange at Camp Lee, Va. The United States is not a party to the contract. The post exchange regulations state that the funds of post exchanges or camp exchanges are not public moneys, and that the United States is not responsible for debts of the exchanges. * * * An order will be entered denying any relief to the claimant in this case."

The regulations of the War Department above referred to also authorize and suggest the voluntary formation in these exchanges of cricket clubs, baseball clubs, tailor shops, golf clubs, etc.

We have no definite information at hand as to how or when the first post exchange known in modern parlance was established; but it can safely be said that such a post exchange as we are now discussing is a descendant of the old sutler's camp. The dictionary tells us that a sutler was or is a small trader, who follows an army, and who is licensed to sell goods, especially edibles, to the soldiers. In other words, the post exchange is nothing more nor less than a stationary soldiers' co-operative sutler's camp or store. When troops are in active warfare and constantly on the march, manifestly a post exchange could not be maintained, and under such circumstances the sutler plies his trade, being authorized to do so by the commanding officer; but where soldiers are stationed for considerable periods of time at a post, then it becomes feasible for them to do away with the inconvenience of trading with a poorly equipped sutler, and with the necessity of paying him profits on his sales, and, instead, to establish for their own convenience and pleasure the soldiers' modern private store or exchange.

It was needless for the Secretary of War to set forth in special regulations above referred to that the funds of such a private store should not be regarded as public moneys as defined in the before-quoted sections of the Revised Statutes. If he had said the reverse, such declaration would not have made it so, and would not have subjected any one to indictment under those sections. It was not necessary that the

Secretary of War should have said that the government would not be responsible for the debts of such an organization, for it is fundamental that the government is not responsible for the debts, defaults, or contracts of any purely private organization, whether such private organization is maintained by soldiers, departmental clerks, or civilians. It is plain, therefore, that the government has not one penny of financial interest in any of these post exchanges.

Indeed the Congress of the United States, recognizing the purely private character of a post exchange, as early as 1892, by an act of July 16 of that year declared:

"Hereafter, no money appropriated for the support of the army shall be expended for post gardens or exchanges." 27 Stat. 178.

And in passing we might say that this is the only reference to a post exchange that we have been able to find in the mass of statutes passed by Congress from its first session down to the present. Congress has recognized the importance of, and necessity for, post schools and post bakeries, and expressly provides for them.

The question here is not whether a post exchange is useful and pleasurable to soldiers, and therefore to the army, but the question we must decide is whether or not a post exchange is such a lawful department of the government as to bring it within the protection of section 37 of the Criminal Code. If the transaction alleged in the indictment in this case is covered by this section of the Criminal Code, then every transaction with a purchaser, representing a post exchange, of baseballs and baseball supplies, of cricket clubs, of golf balls and sticks, and even of playing cards, would be, in case of conspiracy to defraud such organization, subject to the pains and penalties of this drastic criminal section.

Can it be argued, because the soldiers in these special regulations issued by the War Department are given the privilege of forming golf clubs and baseball clubs—it being recommended by the Secretary of War that such clubs be formed—that, should a civilian representing a wholesale manufacturer of golf balls agree with the agent of the soldiers' golf club that if such agent would buy golf balls exclusively from him and agree to pay him 10 cents more for each ball than the market price, then such agent should have a rake-off or commission of 5 cents on every ball so purchased, that such civilian salesman could be indicted and convicted under the section of the Criminal Code in question? The character of the merchandise traded in does not change the principle of law, and the fact that the defendant may have conspired with reference to the purchase of meats would not make the principle one whit different in case of the purchase of baseballs, playing cards, or golf balls. Should we hold that this criminal section does apply to such transaction, would we not be extending and straining the power of the Secretary of War not only to, but beyond, the breaking point?

It will not do to say that because the Secretary of War permits the establishment of post exchange baseball clubs and golf clubs, immediately upon the establishment of same, transactions with them or their

agents are covered by this criminal section. If the Secretary of War had this power, then every new organization or association which he might permit the soldiers to organize would in its transactions with civilians come under the protection of this highly criminal statute, and this would be tantamount to giving the Secretary of War the power to make criminal law, because, if he can create new conditions, which immediately become subject to these criminal laws of the country, his action would be tantamount to giving him the authority to enact a criminal statute.

We do not understand that the Secretary of War even attempted or desired to apply this criminal statute to post exchanges. Indeed, so far as in his power lay, he tried to provide against this very thing by declaring that the moneys belonging to these exchanges were not public moneys and the government should not be responsible for any of their debts. On the contrary, had the Secretary of War in specific terms declared that any person dealing with agents or officers of post exchanges would be subject to the pains and penalties of section 37, supra, such a statement would have been harmless, futile, and void, because there would have been a clear attempt on his part to enact and apply a criminal statute.

In this connection, the counsel for the government, in his brief and argument, insists that post exchanges are governmental institutions, associations, and agencies, and says:

"It cannot be denied that such agencies are established under regulations promulgated and established by the War Department."

He refers us to section 161 of the Revised Statutes (Comp. St. § 235) for the authority of the Secretary of War to make such regulations with reference to these exchanges. The section reads as follows:

"The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of his officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it."

This section only gives the heads of departments, including the Secretary of War, power to issue rules and regulations for the administration of their departments. Indeed, the power conferred by this section is administrative only (U. S. v. George, 228 U. S. 14, 33 Sup. Ct. 412, 57 L. Ed. 712), which means that the Secretary of War, if he had power to issue the regulation at all, only had power to compel or permit the soldiers to establish these post exchanges in question, but could not, in the absence of the express authority of Congress, make persons not connected with his department bound by such regulations, or subject to the pains and penalties of criminal law. If a head of a department has the power to make rules which subject classes of property to forfeiture and classes of persons to penalties, that power must be expressly given him by Congress, and well defined, so as to make his rule or regulation an act of the supreme law-making body. He will get no such power from section 161 of the Revised Statutes. U. S. v. 11,150 Pounds of Butter, 195 Fed. 657, 115 C. C. A. 463.

It has been decided over and over again that a violation of the departmental regulations is not a criminal offense, unless the Congress distinctly makes it so. U. S. v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591; U. S. v. Van Wert (D. C.) 195 Fed. 974. As early as 1833 the question of how far a rule or regulation of a department head could go in creating punishable offenses, was submitted to the Attorney General of the United States, the Attorney General then being Benjamin H. Brewster. The question there was whether or not the top or side of a letter box for the deposit of mail, which box was put in a place designated according to law, was an authorized depository for such matter, so that the taking of stamped papers or packets left on the top of such boxes became an offense punishable under section 5469 of the Revised Statutes (Comp. St. § 10364). It appears that the Postmaster General had authorized the placing of mail matter on the top of the letter boxes, and that under the power given him in section 3868 of the Revised Statutes (Comp. St. § 7276) to establish receiving boxes for the deposit of said mail matter, and under his general power as the head of a department, he seems to have ruled that any one who took such papers or packets from the top of such letter box should be subject to the criminal statutes, although the statute required that the mail matter be deposited therein. The able Attorney General, in discussing this question, says:

"The taking of papers or packets from such a place is like picking them up in the street or on the sidewalk. * * * The statute does not make the outside of a box placed in the street a depository for anything, nor has Congress made the taking of papers and packets left so exposed a punishable offense. If Congress has not done this, no head of a department can do it by the force of a regulation. Section 161, Revised Statutes, which give authority to heads of departments to prescribe regulations, is careful to provide that they must not be inconsistent with law, and when made they are only for the government of the department and the conduct of its officers and the preservation only of the papers and property belonging to the department. No authority is here given to make rules for the conduct of persons not connected with the departments." 17 Ops. Atty. Gen. p. 525.

Mr. Justice Blatchford, in writing the opinion in U. S. v. Eaton, supra, closes the opinion with these words:

"Regulations prescribed by the President and by heads of departments, under authority granted by Congress, may be regulations prescribed by law, so as lawfully to support acts done under them and in accordance with them, and may thus have, in a proper sense, the force of law; but it does not follow that a thing required by them is a thing so required by law as to make the neglect to do the thing a criminal offense in a citizen, where a statute does not distinctly make the neglect in question a criminal offense."

It is well stated in the case of U. S. v. Van Wert (D. C.) 195 Fed. 974:

"Unless the act charged to have been done by the defendant is a violation of some act of Congress * * * or of some departmental rule or regulation authorized by Congress, the violation of which is declared by Congress to be an offense, no crime has been committed."

Blackstone, in the fourth volume of this Commentaries, stated the rule which has been adhered to universally by our courts:

"An offense which may be the subject of criminal procedure must be an act committed or omitted 'in violation of public law either forbidding or commanding it.' "

Judge Sanborn, in the case of U. S. v. 11,150 Pounds of Butter, 195 Fed. 657, 115 C. C. A. 463, clearly states the case when he says:

"A penal statute which creates and denounces a new offense  *  *  *  may not be lawfully extended by either executive or judicial construction to classes beyond its terms. Men must not be punished unless they fall clearly within the class of persons specified as punishable by such a law. The definition of offenses, the classification of offenders, and the prescription of the punishment they shall suffer, are legislative, and neither executive nor judicial functions; and forfeitures, fines, and penalties may not be prescribed, imposed, or inflicted for violations of a regulation of an executive department without previous legislative prescription."

In case of U. S. v. Grimaud, 220 U. S. 506. 31 Sup. Ct. 480, 55 L. Ed. 563, cited by counsel for the government, Mr. Justice Lamar makes clear the distinction between that case and the one at bar when he says:

"The Secretary of Agriculture could not make rules and regulations for any and every purpose. * * * As to those here involved, they all relate to matters clearly indicated and authorized by Congress."

It will be conceded that all heads of departments have equal authority under section 161 of the Revised Statutes in making rules and regulations for the government of their departments.

During the recent war, prices of food products in the city of Washington were so high that the clerks and employés of the Treasury Department, with the consent and approval of the Secretary of the Treasury, established what might be well called a Treasury post exchange or co-operative store. The Secretary granted rooms in the Treasury Building in which food supplies might be stored and distributed. The clerks immediately established their co-operative store, and appointed one of their number to act as their buying and distributing agent, enabling them to buy at wholesale prices and thus eliminate the retailers' profits. This was all done with the sanction of the Secretary of the Treasury and in the Treasury Building owned by the United States. Now, can it be argued that a person could be indicted and convicted for defrauding the United States in that he conspired with the agent of this co-operative Treasury store to inflate prices and give the agent a commission upon the purchases? We think the question answers itself. And yet we think such a co-operative Treasury exchange is of the same class and character of co-operative store as the soldiers had at Fortress Monroe, and for a conspiracy to defraud which the defendant in this case stands indicted.

It is not contended that Congress authorized the establishment of the post exchange at Fortress Monroe either directly or indirectly. It is not contended that Congress anywhere declared that any one who conspired to defraud an agent of a post exchange should be deemed guilty of a conspiracy to defraud the United States, etc., subject to the pains and penalties of section 37 of the Criminal Code. Indeed, we cannot see how the defendant could be convicted under the facts

and the indictment in this case, even though Congress had adopted as part of its laws the entire language of the Special Regulations 59 of the War Department, because these regulations merely permit the voluntary establishment of post exchanges and declare that their funds shall not be public funds, and that the government shall have no responsibility for their debts.

It is not every organization authorized to be formed by Congress that is such a lawful department of the government within the contemplation of this criminal statute. If the contrary were true, then it would be a criminal offense to conspire to defraud every corporation or organization authorized to be established by Congress. This would include dealing with the Young Men's Christian Association, the American Red Cross, the National Educational Association, the American Boy Scouts, and numbers of other organizations which have been authorized and incorporated by Congress. Congress, by the Act of May 31, 1902 (Comp. St. § 1989), expressly gave the Secretary of War power to grant permission to the International Committee of the Young Men's Christian Association of North America to erect and maintain in the military reservations within the United States or its foreign possessions such buildings as their work for the promotion of the social, physical, intellectual, and moral welfare of the garrison may require under such regulations as the Secretary of War may impose. Here is a direct warrant from Congress for the operation of these Christian Associations, and tacit inference that they are necessary for the physical, intellectual, and moral welfare of the soldiers; and yet it will not be argued that this organization is such a "lawful department" of government, subjecting persons who deal with its representatives to the pains and penalties of section 37 of the Criminal Code. The same power was given to the Secretary of War to grant license to the Red Cross to erect and maintain on military reservations buildings suitable for the storage of supplies, etc.

By the Act of June 29, 1886 (Comp. St. §§ 8908-8912), the Congress authorized the establishment and incorporation of national trade unions, and gave such organizations the power to make and establish such constitution, rules, and by-laws as it deemed proper to carry out its lawful object, and the same to alter, amend, add to, or repeal at pleasure, and to define the duties and powers of all its officers and prescribe their mode of election and to establish branches and sub-unions in any territory of the United States. In pursuance of this legislative enactment labor unions have been formed and are operating, but it cannot be argued that, because Congress authorized the formation of such unions, they become such a lawful department of the government as to subject persons dealing with them to the pains and penalties of section 37 of the Criminal Code.

We think that this highly penal statute cannot apply to any lawful department, so as that a fraud upon the United States can arise from or be involved in any transaction concerning it, unless such lawful department is created by Congress or directly authorized by it, and in addition thereto it must be "such a lawful department" as that Congress appropriates the public moneys to maintain and operate. Clear-

ly the post exchange described in the indictment in this case is not such a lawful department of Government. Therefore this post exchange is not such an institution as that a fraud upon the United States can arise from or be involved in any transaction concerning it, and section 37 of the Criminal Code does not apply to transactions with such organization.

We therefore hold that the defendant is not guilty of crime under the indictment, and the judgment is therefore reversed. As this ruling disposes of the entire case, it is unnecessary to consider the defendant's other assignments of error.

Reversed.

WOODS, Circuit Judge. I agree that there should be a new trial, but am unable to concur in the reasoning of the majority opinion. I think the indictment sets out and the proof sustains the charge of "conspiracy to defraud the United States." In substance, the charge is that the defendant, a salesman of groceries, conspired with W. R. Brown, a private in the army assigned to duty in the post exchange at Fortress Monroe, that in consideration of money to be paid by defendant to Brown the defendant should fraudulently sell and deliver, and Brown, in his capacity as a soldier assigned to duty at the post exchange, should fraudulently receive and check goods at prices increased by reason of the corrupt agreement, and that Brown should fraudulently cause the invoices to be presented to the proper officer of the post exchange for payment. The overt act in furtherance of the conspiracy was the payment of the $200.00 to Brown.

The contention on behalf of the defendant is that a post exchange performs no lawful function of any department of the government, and that therefore the conspiracy charged was not a conspiracy to defraud the United States. The system of post exchanges was a government undertaking of the War Department and is universally recognized as an adjunct of that department. It had its foundation and has its existence in an order of the Secretary of War for the promotion of the welfare of the soldiers of the United States army. Regulations for the management of all post exchanges are prescribed by authority of the President, as Commander in Chief of the army, through the Secretary of War. The exchanges are conducted by officers and soldiers designated and assigned as such under authority of the Secretary of War to perform that official military duty. Every post commander is required by the regulations to institute a post exchange. No soldier or other person has any authority or control of the affairs of post exchanges, except by military order. The regulations for their management have force of law under section 161 of the Revised Statutes of the United States. U. S. v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591; U. S. v. Foster, 233 U. S. 515, 34 Sup. Ct. 666, 58 L. Ed. 1074.

The mere facts that the government does not assume the debts or claim the profits, and that soldiers are not required to join the post exchanges, are not controlling; for even the distribution of their profits and assets and the payment of their debts are regulated by the War

Department. It can hardly be doubted that an officer refusing to perform the miltary duty of establishing or maintaining a post exchange would be subject to court-martial.

The commander of an invading army often assumes the like official duty of safeguarding private property, by detailing soldiers to take charge of it and guard it. One who conspires with such a guard to steal such private property so held in trust by the government would be guilty of a conspiracy to defraud the government, as trustee in possession of the property. The following language by Mr. Justice Lurton in Haas v. Henkel, 216 U. S. 462, 479, 30 Sup. Ct. 249, 253 (54 L. Ed. 569, 17 Ann. Cas. 1112), seems to me to decide the question:

"But it is not essential that such a conspiracy shall contemplate a financial loss, or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of the government. Assuming, as we have, for it has not been challenged, that this statistical side of the Department of Agriculture is the exercise of a function within the purview of the Constitution, it must follow that any conspiracy which is calculated to obstruct or impair its efficiency and destroy the value of its operations and reports as fair, impartial and reasonably accurate, would be to defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation. That it is not essential to charge or prove an actual financial or property loss to make a case under the statute has been more than once ruled."

The argument that this view means that the President or Secretary of War may create a separate crime by promulgation of army regulations seems clearly unsound. The true view is that the Congress, by section 37, made it a conspiracy against the United States to make a corrupt agreement that an officer or soldier of the army should be false to the duties imposed on him by the army regulations having the force of law.

I think the jury could infer that prices were increased to the post exchange in consideration of the payments made by the defendant from the evidence of the payment of higher prices than to other dealers, the payment of the bribe of $200, the giving of the order for $300 at the same time, and the evidence of Wright, Brown's superior, that he got from defendant 3 per cent. on all purchases, and was charged thereon with the $300 paid to Brown.

There was, however, no direct proof that the prices were increased to the post exchange over the defendant's usual selling prices. This being so, the defendant had a right to introduce any competent evidence tending to show that the money paid by him was a gift to Brown to induce him to give preference to the defendant in the purchase of goods at the regular market prices. I think, therefore, that the District Judge erred in excluding evidence offered by the defendant to the effect that the prices charged by him to the post exchange were the same as those charged to hotels and other customers. This error, affecting the real vital issue, requires a new trial.

The government introduced evidence that goods were bought for the post exchange from other dealers at less prices for similar articles.

The defendant met this by evidence to the effect that the goods sold by him were of superior quality. In rebuttal the government introduced testimony to the effect that some of the goods received from the defendant were in the marked containers of other dealers who sold to the post exchange at less prices. To meet this evidence in the government's rebuttal, the defendant offered a witness to prove that, owing to the scarcity of containers, he had packed some of the goods sold by defendant in the empty containers of other dealers. I think it would have been better to admit the testimony of this last witness, but the admission or rejection of evidence in surrebuttal is largely in the discretion of the trial court, and I am not prepared to say that the exclusion of this evidence, standing alone, would be sufficient ground for reversal.